**LAW MATHEMATICS AND TECHNOLOGY, INC.,**
Appellant,

v.

**The UNITED STATES, Appellee.**

**Appeal No. 85-2150.**

United States Court of Appeals, Federal Circuit.

Dec. 12, 1985.

**676**

George C. Sponsler, III, Bethesda, Md., argued for appellant.

John S. Groat, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director, Washington, D.C.; Raymond M. Katona, Office of Naval Research, Arlington, Va., of counsel.

Before RICH, SMITH and NEWMAN, Circuit Judges.

RICH, Circuit Judge.

This appeal is from the October 29, 1984, final decision of the Armed Services Board of Contract Appeals (board), No. 29714, 85–1 BCA (CCH) ¶ 17,765 (ASBCA 1984), denying appellant Law Mathematics and Technology, Inc. (LMT) additional funding for a contract involving research on air-launched and anti-ship missile defense for the Navy. We affirm.

### Background

LMT is a research and development consulting firm. The president and principal corporate officer of LMT is George Curtis Sponsler, III, Ph.D, a lawyer recently admitted to the bar and a former employee of the Navy. Dr. Sponsler operates the consulting business from his personal residence in Bethesda, Maryland, and is also acting as LMT's counsel. He states in his reply brief that in the period here involved the contract at bar "was LMT's only source of revenue."

In 1982 LMT submitted an unsolicited research proposal to the Office of Naval Research (ONR) for a four-phase research project to identify anti-ship missile defense requirements. Phase I covered "defense of a single ship against air-launched missiles," and listed a total cost of $99,607 to be paid to LMT and a subcontractor.

The Navy handles such research proposals by assigning them to a "scientific officer," who reviews the proposal and then determines whether to recommend or deny funding for the proposal. The scientific officer who reviewed LMT's proposal for the ONR, Dr. Thomas Varley, indicated to LMT that the Navy was interested in certain portions of the proposal. At Varley's suggestion, LMT submitted an amended proposal in December, 1982, which emphasized Phase I of the original proposal. In July, 1983, Varley again expressed interest in the proposal, but explained to Sponsler that the Navy lacked sufficient funds at that time to pay the entire $99,607. Varley then asked Sponsler how much it would cost the Navy to have LMT work on Phase I for the remainder of the 1983 fiscal year ("FY 83," until September 30, 1983). Sponsler replied that $50,000 would be adequate, and Varley prepared and submitted a procurement request for $50,000 toward completion of Phase I.

As a result of the scientific officer's request, the Navy approved the expenditure of $50,000 towards the performance of Phase I of the LMT proposal and turned the matter over to one of its contracting officers, David van Metre, to negotiate a contract. During negotiations van Metre informed Sponsler that the Navy was not interested in Phases II–IV, and that because only $50,000 had been allotted to performance of Phase I, the proposed contract would include a "Limitation of Funds" clause. Van Metre also informed Sponsler that LMT could begin work at its own risk, and LMT commenced working on the project on July 18, 1983. The contract was formally executed on September 12, 1983.

The first page of the contract noted that $50,000 had been allotted by the Navy for LMT's work. The Limitation of Funds clause provided, *inter alia*, that "[t]he Contractor agrees to perform or have performed work on this contract up to the

point at which the total amount paid and payable by the Government pursuant to the terms of the contract approximates but does not exceed the total amount allotted to the contract." In addition, the contract included an "Explanation of Limitation of Funds" which provided:

It is hereby understood and agreed that the Estimated Cost of the performance of this contract is $95,075.00, the Fixed Fee is $4,532.00, and the Total Estimated Cost & Fixed Fee is $99,607.00. The amount presently available for payment and allotted to this contract is an Estimated Cost of $47,710.00, a Fixed Fee of $2,290.00, and a Total Estimated Cost & Fixed Fee of $50,000.00. It is estimated that the amount allotted of $50,000.00 will cover the period 18 July 1983 through 30 September 1983.

If additional allotments were not made to the contract, the rights of the parties were to be governed by subsection (d) of the Limitation of Funds clause:

(d) Except as required by other provisions of this contract specifically citing and stated to be an exception from this clause, the Government shall not be obligated to reimburse the Contractor for costs incurred in excess of the total amount from time to time allotted to the contract, and the Contractor shall not be obligated to continue performance under the contract ... or otherwise to incur costs in excess of the amount allotted to the contract....

At the time of signing the contract, Sponsler was aware that only $50,000 of appropriated 1983 funds had been allotted for performance of the contract, and no promises or assurances of any kind were expressly or impliedly made to LMT by any representative of the Navy that Congress would appropriate or that the Navy would allot fiscal year 1984 ("FY 84") funds to cover LMT's efforts beyond the $50,000 amount in the contract. Nevertheless, near the end of August, 1983, scientific officer Varley prepared an additional procurement request from FY 84 funds for $49,608, the final portion of the estimated cost of Phase I, to be added to the original contract by way of modification of the contract. After submitting the procurement request, Varley was transferred to another Navy office and no longer monitored LMT's contract.

The ONR was "disestablished" by the Navy in early September, 1983, and the LMT contract was transferred to the Naval Tactical Support Activity (NTSA). On or about September 15, 1983, the Navy, acting through the NTSA, denied the procurement request for additional funds. At that time, van Metre attempted to inform Sponsler of the Navy's decision by telephone, but van Metre was unable to reach him because Sponsler was apparently on vacation.

On November 3, 1983, Sponsler called van Metre, in accordance with the Limitation of Funds clause of the contract, to inform him that he expected to incur costs in excess of the original $50,000 allotment. Van Metre then informed Sponsler that no additional funds would be allotted and requested that LMT bring the contract to an orderly conclusion, using the unspent funds to prepare a report on work accomplished up to that point. Sponsler then informed the subcontractor that work was being curtained and prepared the report. LMT received a total of $50,000 for performing the contract.

After an unsuccessful effort to convince the Navy to invest additional funds to complete Phase I as well as the previously proposed Phases II–IV, Sponsler filed a claim for additional funding with van Metre on March 15, 1984. Van Metre denied the claim in its entirety, and LMT appealed to the board.

### The Board's Decision

The board found that both parties to the contract specifically agreed that the Navy had allotted only $50,000 out of FY 83 funds for LMT's services plus a fixed fee. The board also held that the language of the contract is clear and unambiguous and that there was no promise in the contract to allot more than $50,000.

The board also found that there was no credible evidence that the Navy promised or represented via words, actions, or inactions that funds beyond the $50,000 specified in the contract would be allotted, appropriated, or in any way made available. Moreover, said the board, even if it be assumed that the Navy's actions inferred a promise or representation that additional funds would be allotted to the contract, the evidence disclosed no reasonable reliance to its detriment by LMT. Thus, the board concluded, there was no legal basis to stop the contract from "dying a natural death."

## OPINION

The Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613, provides for judicial review of decisions of agency boards of contract appeals. *See* 41 U.S.C. §§ 607(g) *and* 609. This court's scope of review of board decisions is governed by 41 USC 609(b), which provides that the board's decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, arbitrary, capricious, "so grossly erroneous as to necessarily imply bad faith," or "is not supported by substantial evidence." *See Erickson Crane Company of Washington, Inc. v. United States*, 731 F.2d 810, 814 (Fed.Cir. 1984) and *United States v. General Electric Corp.*, 727 F.2d 1567, 1572 (Fed.Cir. 1984).

■ There is more than substantial evidence to support the board's conclusion that the language of the contract clearly and unambiguously limited the Navy's obligation to paying LMT no more than $50,-000. The only legal issue for this court to decide is whether the Navy should be estopped from allowing the contract to expire and "[die] a natural death," according to its terms.

■ LMT argues that the Navy is barred by the doctrine of promissory estoppel from "withdrawing" the FY 84 funding. That argument is based on the assertion that the Navy representatives exhibited a course of conduct, in actions and inactions, that implied a promise that FY 84 funding

would be provided to permit the contemplated conclusion of Phase I.

The doctrine of promissory estoppel was originally set down as Section 90 of the Restatement of Contracts. The text of Section 90, as it appears in the Second Restatement provides:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

A party claiming an estoppel of this nature must prove, first, that there was a promise or representation made, second, that the promise or representation was relied upon by the party asserting the estoppel in such a manner as to change his position for the worse, and, third, that the promisee's reliance was reasonable and should have been reasonably expected by the promisor. *See Heckler v. Community Health Services of Crawford*, 467 U.S. 51, ——, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984).

In rejecting LMT's estoppel argument, the board determined that there was no credible evidence that the Navy made any promise or representation that funds beyond the $50,000 specified by the contract would be allotted and that LMT did not reasonably rely to its detriment on such a promise or representation. We agree. There was no promise to allot more than $50,000 for LMT's performance. LMT's allegations regarding the "implication" of a promise, which are based primarily on Sponsler's own assumption that Phase I of LMT's research proposal would be funded in its entirety, are not sufficient to prove the existence of such a promise or representation.

The board also determined that LMT failed to prove detrimental reliance on any promise or representation, assuming *arguendo* that one was made. To prove detrimental reliance, LMT must demonstrate that its action or forbearance amounted to

a substantial change of position. The abandonment of a peppercorn or the turning over of the hand is not enough. Corbin on Contracts, § 200. Here, LMT provided only those services which were funded under the original $50,000 allotment and acted to keep its performance within such limits. Sponsler, after he was informed that no money beyond the original $50,000 would be forthcoming, did as he was asked by van Metre and used the remaining FY 83 funds to prepare a report on the work accomplished up to that point, rather than proceeding to complete Phase I in its entirety.

Sponsler claimed that LMT's damages were "what I would have earned had I been able to work" on the contract and that LMT concentrated solely on the Navy contract, thereby causing it to forbear from entering the market for other contracts. However, LMT failed to introduce any evidence of anticipated profits on the Navy contract or any evidence that it had plans to enter the market for other contracts. Such a speculative claim of damage does not amount to a "substantial change of position" so as to prove detrimental reliance within the meaning of the doctrine of promissory estoppel.

Finally, even if LMT had relied to its detriment on any promises or assertions made by the Navy, such reliance could not have been reasonable in this case. Dr. Sponsler is an attorney, with the ability to understand the specific limitations of the contract language. Moreover, Sponsler is also a former Navy employee, and should have been, if he was not, familiar with the uncertainty of relying on additional allocations to Navy research contracts.

This situation is distinguishable from that in *American Electronics Laboratories, Inc. v. United States,* 774 F.2d 1110 (Fed.Cir.1985), in which this court recently held that the government was estopped from invoking a similar Limitation of Funds clause. In *American Electronics,* the contractor had experienced cost overruns in excess of $1,000,000 in continuing performance on a contract for the production of electronic test equipment for the Army. While the Limitation of Funds clause asserted by the government was virtually identical to the clause in this case, the court held that the contractor continued performance by reasonably relying on the conduct of the government, whose representatives clearly implied that additional funds would be forthcoming.

None of these estoppel elements are present here. LMT has not proved that the government's conduct caused it to reasonably rely on additional allotments to the contract or even that LMT continued to perform the contract after notifying the government that it anticipated needing additional funding. LMT has thus failed to prove any of the elements necessary to prevail in its claim, under the doctrine of promissory estoppel or otherwise.

*Conclusion*

For the foregoing reasons, the decision of the board is in all respects *affirmed.*

AFFIRMED.